NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
                                    :
PETER A. RAETSCH, GERALDINE         :
RAETSCH and CURTIS C. SHIFLETT,     :
individually and on behalf of all others :
similarly situated,                 :    Civil Action No. 05-cv-5134 (PGS)
                                    :
        Plaintiff,                  :
                                    :
        v.                          :    OPINION
                                    :
LUCENT TECHNOLOGIES, INC., LUCENT   :
TECHNOLOGIES, INC. EMPLOYEE         :
BENEFITS COMMITTEE, AND LUCENT      :
TECHNOLOGIES, INC. MEDICAL EXPENSE  :
PLAN FOR RETIRED EMPLOYEES,         :
                                    :
        Defendant.                  :
_____ :

**SHERIDAN, U.S.D.J.**

Plaintiffs are retired, long-service employees of AT&T or one of its subsidiaries who initially were participants in AT&T's management pension plan and retiree medical benefits plan. In 1996, AT&T decided to divest certain of its manufacturing businesses and spun off a new company, defendant Lucent Technologies, Inc. ("Lucent"). In connection with that business transaction, AT&T also transferred certain active employees who were employed in the divested businesses to Lucent. In addition, AT&T transferred, and Lucent assumed, the obligation to provide pension, medical and other benefits obligations for the transferred employees. Billions of dollars of pension plan and medical plan assets were transferred to Lucent for this purpose. The benefits obligations for retired employees who had worked in the divested businesses, including plaintiffs and the proposed Class, also were transferred to Lucent together with significant assets.

Starting in September 1999, Lucent made transfers of "excess" assets in the amount of $888 million over four years from the management pension plan covering plaintiffs and the proposed Class to a new health care account within the pension plan in order to use dedicated pension plan assets to pay for retiree medical benefits. It is undisputed that the Internal Revenue Code ("IRC"), 26 U.S.C. § 401, *et seq.*, allows such transfers without tax consequences so long as certain conditions are met. (*See*, IRC §§ 401(h) and 420). The major condition for allowing the tax free transfer of excess pension funds is that the transferred funds will be used in conjunction with payment of retiree health benefits for a period of time which this Court refers to as the Health Maintenance Period. That is IRC § 420 requires the plan sponsor to either maintain substantially the same level of retiree medical benefits for five years or maintain the amount spent per participant on such benefits (cost maintenance) for the same length of time (the standard changed due to a statutory amendment).

Defendants were cognizant of the Health Maintenance Period. In December, 2004, Lucent amended the terms of the pension plan (retroactive to January 1, 2000) to refer to and incorporate the Heath Maintenance Period. The amendment reads in applicable part:

> 5. Section 5.9(a) of the Plan is hereby amended, effective December 17, 1999, by deleting the second sentence thereof, and in its place substituting the following:
>
> > "No transfer of excess pension assets from the defined benefit portion of the Pension Fund to the Health Care Fund will be made in any taxable year beginning after December 31, 2005"
>
> 6. Section 5.9 of the Plan is hereby amended, effective December 17, 1999, by adding a new Section 5.9(c) as follows:
>
> > "(c) Applicable Employer Cost and Cost Maintenance Period
> >
> > > (i) Effective December 17, 1999, an asset transfer will be permitted only if each group health plan or

>> arrangement provides that the Applicable Employer Cost for each taxable year during the Cost Maintenance Period is not less than the higher of the Applicable Employer Costs for each of the 2 taxable years immediately preceding the taxable year of the "Qualified Transfer.
>
> (ii)   If the Cost Maintenance Period for any Qualified Transfer after the date specified above includes any portion of a Benefit Maintenance Period for any Qualified Transfer on or before such date, the provisions set forth in subsection (1) above shall not apply to such portion of the Cost Maintenance Period, and such portion shall be treated as a Benefit Maintenance Period."

7. Section 5.11 of the Plan is amended, effective December 17, 1999, by redesignating existing subsections (a) and (b) as subsections (b) and (c) respectively and adding a new section (a) as follows:

> "(a)   Applicable Employer Costs.
>
> With respect to any taxable year, the term "Applicable Employer Cost" means the amount determined by dividing (i) the qualified current retiree health liabilities of the employer for such taxable year determined without regard to any reduction under Code § 420(e)(1)(b), and in the case of a taxable year in which there was no Qualified Transfer, in the same manner as if there had been such a transfer at the end of the taxable year, by (ii) the number of individuals to whom coverage for Applicable health benefits was provided during such taxable year."

8. Section 5.11 of the Plan is further amended, effective December 17, 1999, by redesignating existing subsections (d) through (f), as subsections (e) and (h) respectively, and adding new subsection (d) as follows:

> "(d)   Cost Maintenance Period

> The term "Cost Maintenance Period" means the period of 5 taxable years beginning with the taxable year in which the Qualified Transfer occurs. If a taxable year is in two or more overlapping Cost Maintenance Periods, this section shall be applied by taking into account the highest applicable Employer Cost required to be provided under Section 5.9(c) for such taxable year."

Despite these provisions plaintiffs allege defendants made a "series of severe cuts in the program of retiree medical benefits, either by reducing levels of coverage, increasing co-payments and deductibles and/or imposing contribution requirements of plaintiffs and their spouses as well as other members of the Class."

II.

Defendant contends that the complaint must be dismissed because the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, provides "no private cause of action to enforce Code Section 420"; and plaintiffs have failed to "exhaust their plan administrative remedies" before bringing suit. Both parties substantially agree to the standard of review for analyzing this motion.

The standard of review for a motion to dismiss in a facial attack under Rule 12(b)(1) for lack of subject matter jurisdiction is similar to the standard governing a Rule 12(b)(6) motion. *In re Franklin Mutual Funds Fee Lit.*, 388 F. Supp. 2d 451, 459 (D.N.J. 2005). In a Rule 12(b)(6) motion to dismiss for failure to state a claim, the well-pleaded factual allegations contained in a complaint must be accepted as true. *Semerenko v. Cendant Corp.*, 223 F. 3d 165, 181 (3d Cir. 2000); *Nami v. Fauver*, 82 F. 3d 63, 65 (3d Cir. 1996). However, the court will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *Kelly*

*v. Edison Township*, 377 F. Supp. 2d 478, 481 (D.N.J. 2005).  In ruling on a motion to dismiss, a court may consider the allegations of the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim.  *Lum v. Bank of America*, 361 F. 3d 217, 222 n. 3 (3d Cri. 2004).  Thus, in an action asserting claims under ERISA, the court may properly consider the Plan document in its entirety." *See*, *Pietrangelo v. NUI Corp.*, 2005 WL 1703200 at *3 (D.N.J. July 20, 2005).

III.

Since ERISA was first enacted in 1974, its administration has been divided among the Employee Benefits Security Administration (EBSA) within the Department of Labor, the Internal Revenue Service (IRS) within the Department of Treasury and the Pension Benefit Guaranty Board (PBGB)[1].  In addition, under certain circumstances, aggrieved parties could bring an action in the district court.  ERISA § 502(e).  Due to this shared oversight, there have been questions of which entity has authority in a particular matter.  The courts have been called upon to sort out these jurisdictional disputes, i.e. which claims should be brought before which entity in light of the Congressional intent.  *See*, *generally*, *Reklau v. Merchant National Corp.*, 808 F. 2d 628, 630 (7 Cir. 1986).  This case represents another instance where the court must determine whether it or an agency (IRS) has authority to address plaintiffs' claims.  In order to determine whether the Complaint is barred because there is no private right of action to enforce IRC § 420, a brief review of the statutory history of the section is required.

---

[1]      Formerly known as the Pension and Welfare Benefits Administration (PWBA). http://www.dol.gov/ebsa/aboutebsa/history.html.

Commencing in the early eighties, many corporations realized that their retirement plans were overfunded. Officers of the corporations wished to access those funds so they could be utilized for corporate purposes. The transfers came to the attention of Congress in the mid-eighties. Congress found that "investment bankers involved in leveraged buy-outs and corporate raiders view a pension fund with assets in excess of those necessary to pay benefits as a source of ready cash." 1990 U.S. Cong. and Admin. News, Vol. 5, p. 2051. Ingenious business persons devised a legal mechanism to gain hold of the excess monies within the pension fund. A company terminates its overfunded pension plan in accordance with ERISA regulations, and simultaneously, created a new plan minus the excess funding. *Id.* at 2052. This new "phenomenon" was unheard of at the advent of ERISA. As with most Congressional concerns, there were two sides to the argument. On one side, there was outrage that corporations could "raid" funds held in trust for the benefit of employees which may undermine a plan's future solvency for corporate greed; and on the other, the transfers were applauded as a method to fuel economic expansion. Underlying this debate was the issue of whether such transfers were subject to taxation. In 1983, the IRS softened its position with regard to the definition of excess funds which prompted more transfers. *Id.* at 2052. There were several years of hearings, and in the mid-eighties, the Reagan Administration and the democratic congress agreed that wholesale transfers of excess pension funds were inappropriate. *Id.* at 2053. However, the lawmakers could not agree on the fix. Finally in 1990, a compromise was forged as stated in the previous section and the law was enacted. P.L. 101-508. At that time, Congress determined that excess pension funds could be transferred without tax consequence so long as the transferred monies were used to fund medical health benefits of employees, and so long as the plan sponsor agreed to the Health Maintenance Period. (I.R.C. § 420). If these conditions were breached, then the

transferred monies would be subject to a significantly higher excise tax (40% rather than 20%). 1990 U.S. Cong. and Admin. News, Vol. 5, p. 2058.

As stated above, defendant argues that plaintiff is seeking to enforce an IRS provision, and Congress has established no private right of action which permits same. *Chemtech Industries, Inc. v. Goldman Financial*, 809 F. Supp. 729 (ED Mo. 1992). This court disagrees with defendant's analysis for the following reasons. The defendants posit their argument on the holding in *Chemtech*. In *Chemtech*, plaintiff, a plan participant, sought to enjoin a IRC § 420 transfer of excess pension funds to an account to pay health plan benefits because the plaintiff believed the transfer would undermine the solvency of his pension plan. The court denied injunctive relief on a number of grounds, including there is no private right of action for enforcement of an IRS provision. *Id*. at 734. As the *Chemtech* court found, IRC § 420 does not prohibit transfers which fail to meet the requirements of the provision, it merely subjects such non-conforming transfers to onerous taxation. *Id.* However, *Chemtech* is factually distinguishable from the present suit. In *Chemtech*, the object of the suit was to prevent a IRC § 420 transfer; here, the parties agree that at the time of the transfer (IRC § 420) the transaction was valid. Here, albeit, years after the transfer but at the behest of the IRS, Lucent was required to incorporate the provisions of IRC § 420 into its Plan. Accordingly, the object of plaintiff's suit is to seek damages for a breach of a fully integrated term of the Plan. This is a breach of contract theory. This is quite different from the *Chemtech* challenge which solely concerned the transfer.

Similarly, defendant also relies upon *Reklau v. Merchant Nat'l Corp.* as dispositive. But it is distinguished for the same reasons as *Chemtech*. As in *Chemtech*, the *Reklau* court found that it had no jurisdiction to enforce certain provisions of the IRC since those powers are exclusively vested

within the IRS. *Reklau*, 808 F.2d at 630-31.  As in *Chemtech*, the IRC provision in question was not incorporated into the Plan.  Since, *Reklau* was limited to the Code enforcement and not a plan term, it is different from the case at bar. In this case, the Court finds that by adoption of IRC § 420 language and its incorporation into the Plan, it became a substantive term of the Plan and enforceable as any other provision of the Plan.

Generally, when the terms of a statute are incorporated into a contract, they become subject to principles of contract law.  *See*, *generally, Mobil Oil v. United States*, 530 U.S. 604 (2000). In *Mobil Oil*, several oil companies in 1981 entered into a ten year contact with the United States granting oil exploration rights off the coast of North Carolina so long as certain conditions were met including permitting under various statutes. In consideration thereof, the companies paid the government a $156 million up front bonus. Sometime in 1989, the companies, the Department of Interior and the State of North Carolina entered into a Memorandum of Understanding regarding the review process for the exploration plan. Thereafter, in 1990, the companies submitted a final exploration plan to the appropriate governmental entities.  Two days prior to the approval, a new statute (Outer Banks Protection Act "OBPA") became effective.  The law banned oil exploration in the Outer Banks.  *Id.* at 611-13.  As a result, the companies sued based on the principals of contract law (repudiation) for return of their money ($156 million). Justice Beyer, writing for the majority, held, among other things, that the statutes enumerated within the contract were legitimate conditions to the contract; and that the enactment of OBPA merely served to repudiate the contract. That is, it was a "statement by the obligor indicating the obligor will commit a breach."

*Mobil Oil* is instructive in deciding the case at bar because it recognizes that laws incorporated by reference into a contract constitute valid and enforceable terms of the contract. *Id.*

at 608.  Similarly here, IRC § 420 as incorporated becomes enforceable by the plan participants, as any other contract term.   In this case, to the extent that plaintiff's complaint sets forth a cause of action based on breach of conduct, it may proceed.

This ruling is consistent with Congressional intent.  By enactment of IRC § 420, Congress was regulating use of excess pension funds for purposes other than payment of pensions.  Congress approved same so long as the funds were used to pay ever increasing medical benefits of the plan members during the Health Maintenance Period. Congress' primary intent was not to collect additional excise taxes; but to discourage transfers for purposes other than to secure health benefits for a foreseeable time period.  Congress rightfully concluded that the IRS was well equipped at the time of transfer of funds to review the transfer on its face and determine whether excise taxes are due. However, common experience tells us that the IRS is woefully understaffed to monitor compliance with the Health Maintenance Period years after the transfers, as occurred here. Allowing members to secure the medical benefits in a manner consistent with IRC § 420 based upon contract terms relieves the IRS of this burden while maintaining a viable remedy for plan participants. This is probably the reason the IRS insisted that Lucent incorporate the statute into its plan. There is nothing in this opinion which precludes or infringes upon the IRS's right to review tax issues surrounding the Lucent transfers.  It is independent of the Plan's participants' rights.

### III.

The defendants also argue that the Complaint should be dismissed for failure to exhaust plan remedies.  The Lucent Retirement Income Plan is a comprehensive document which covers both pension payments (Article 4) and post retirement health benefits (Article 5) as well as a separate document entitled the Medical Expense Plan for Retired Employees (MEPRE). Pursuant to the

general provisions of the Plan, an Employee Benefits Committee (Committee) is appointed by Lucent to administer the Plan (Section 2.12). The Committee appoints a Benefits Claim and Appeal Committee of Lucent (BAC) which has "authority with respect to claims for benefits" (Sect. 3.2(d)); however, the Committee "serves as the final review Committee . . . for the review of all appeals by Participants and beneficiaries whose initial claims for benefits have been denied by BAC." (Section 3.3a). The decision of the Committee is "conclusive" (Section 3.4). According to Section 3, a participant must appeal the adverse decision of BAC to the Committee within 60 days of denial and it must be in writing.  Article 5 of the Plan establishes post retirement health benefits and is the section in which the provisions of IRC § 420 are incorporated (Section 5.1). Article 5 refers to a "health plan" which is presumably a reference to MEPRE. The appeals procedure in Section 3 above is also incorporated by reference into this section; however, the exhaustion provisions under MEPRE do not conform with the exhaustion provisions in Article 3, as explained below.

  Under MEPRE, the appeals process is similar to those customarily used by health care insurers.  Under all health plans offered by Lucent (except HMO), a participant must submit any claims within 15 months of the date of service to the claims administrator (Section 18.2). If payment is denied, the participant is notified; however, if no notice is received within 90 days, the claim is deemed denied (Sect. 18.3 (1) and (2)).  A participant may file an appeal of a denial in writing within 60 days to the claims administrator. (Section 18.4(1)). The claims administrator shall make a determination within 60 days unless the time is extended (Section 18.4(2)). If the claim is denied, then the claims administrator must determine whether the claim is eligible for "Third Party Review". It appears that most claims are subject to third party review (Section 18.5).  The participant must request third-party review within sixty days of notification of eligibility.  The decision of the third

party administrator is final (Section 18.4(3)).

MEPRE also discusses the scope of authority of the various parties within the appeal process. With regard to the claim administrator, its authority is final (except for third party review) for "all questions arising out of the Plan and interpretation of Plan provisions." (Section 18.6.1). However, the Board of Directors of Lucent have sole and complete "discretionary authority to interpret terms and determine questions." (Sect. 18.6.3) What is clear is that the Plan requires a participant to "pursue all claims and appeals" prior to seeking "any other legal recourse regarding any claim of benefits". (Sect. 18.7).

The problem here is that MEPRE (Article 18) exhaustion requirements appear to apply to specific medical claims as opposed to a carte blanc alteration in benefits as plaintiffs allege. For example, the third party reviewer may be "a physician or other clinical reviewer on its panel of specialists whose medical speciality is related to the issue presented by Participant's claim" (Sect. 18.5.4). Obviously, this provision contemplates an expert to resolve the reasonableness of a medical claim. Article 18 does not envision the type of revisions which plaintiff alleges - - a plan wide change with regard to deductibles and co-pays.

With the two exhaustion procedures in mind, the Court must address several issues. They are (a) whether exhaustion is required or is there an independent basis to bring suit as plaintiff alleges; (b) if exhaustion of plan remedies is appropriate then which exhaustion provision is applicable (Article 3 of Plan or Article 18 of MEPRE); and finally (c) do the competing exhaustion provisions create an ambiguity in Plan terms so as to require some alternative relief.

The first issue is whether exhaustion of Plan Remedies is required at all under these circumstances. Plaintiffs argue that it is not required because ERISA permits this suit pursuant to

11

its anti-inurement section. ERISA § 1103(c).  The court rejects this analysis. As determined above, the Court found that plaintiff's claim was not barred because it was seeking to sue on a breach of a term of the plan rather than an IRC provision. The court further reasoned that the integration of IRC § 420 into the Plan required that it be treated as any other Plan provision.  From reading the Plan as a whole, the Plan requires exhaustion of Plan remedies prior to seeking redress in the court including the incorporation of IRC § 420 issues.  The courts generally favor compliance with exhaustion provisions because they can often resolve disputes without court involvement; or alternatively the process crystalizes the issues, and the court has the benefit of the reasoning of those entrusted with implementing the plan. *See, Henshaw v. Roofers Local #4 Pension Fund*, Slip Copy, 2006 WL 2715138 at *2 (D.N.J. Sept. 22, 2006). As Judge Cavanaugh found, "The board of trustees who administers ERISA plans "are granted broad fiduciary rights and responsibilities under ERISA....and implementation of the exhaustion requirement will enhance their ability to expertly and efficiently manage their funds by preventing premature judicial intervention in their decision-making process." *Id.* (quoting *Amato v. Bernard*, 618 F.2d 559, 567 (9th Cir. 1980)). S*ee also, Zipf v. Am. Tel. & Tel. Co.*, 799 F.2d 889, 892 (3d Cir. 1986).

Plaintiffs freely admit that they did not pursue Plan remedies concerning the elimination of benefits because they elected alternative rights under ERISA.  Since the court has determined the plaintiffs' claims can only survive if they are viewed as terms of the plan, then it seems to reason that the claims must be adjudicated in context of all Plan provisions. In this case, the Plan including provisions of MEPRE are sufficiently clear in that they require exhaustion of Plan remedies, in the first instance, prior to seeking judicial redress.

Plaintiff's attorneys argue that to require exhaustion is an exercise of futility. Whether to

excuse exhaustion on futility grounds rests upon weighing several factors, including whether plaintiff acted reasonably in seeking immediate judicial review; existence of a fixed policy denying benefits; and failure of the insurance company to comply with its own internal administrative process. *Harrow v. Prudential Ins. Co.*, 279 F.3d 244, 250 (3d Cir. 2002)(citing *Berger v. Edgewater Steel Co.*, 911 F.2d 911, 916-17 (3d Cir. 1990)). As far as this court has been informed, the claims in this case have not been submitted to the plan fiduciaries by plaintiffs. The plaintiffs contend that they did not submit same becuase the case would most likely return to court. That may be so; but given the court's proclivity to enforce the terms of a plan adopted under ERISA, and the benefit to the judiciary to know the rationale of the Plan fiduciaries, it is prudent to allow the Plan fiduciaries to review the claims in a manner consistent with the Plan's terms. *Harrow*, 279 F.3d at 250.

      The issue that arises is whether a participant could have reasonably determined from the plan documents which exhaustion provisions were applicable. It is obvious that some confusion exists. Lucent's attorney at oral argument wavered. At argument, the Court inquired of defendants who would decide plaintiff's claim, if exhaustion were ordered. The response was that the Plan had not decided; but (paraphrasing), that maybe someone independent would be appointed. In addition, in Lucent's brief, exhaustion is argued but the defendants do not cite to any particular plan provision for support. This is most likely due to the fact that the attorneys recognized that there were conflicting provisions between the Plan and MEPRE. If this Court and the plan attorney can not readily determine which is the appropriate route, then it would be unjust to rule that a participant should have known.

      The Court is concerned that the competing exhaustion provision requirements may have created confusion among the participants regarding their applicability. There is nothing in the records

13

which suggest that plaintiff's were advised of the right of appeal at the time when the copays and deductibles were allegedly changed. In light of same, the court will not dismiss this action; but rather order that the Plan fiduciaries review the precise exhaustion procedure to be utilized here, to implement it, and to decide the substantive matters presented by the named plaintiffs in this case. This includes, but is not limited to, the timeliness of such claims, the Health Maintenance Period, whether co-pays, etc. were changed in violation of plan terms, and how the decision impacts the purported class. Prior to December 31, 2006, defendant shall report its factual and legal finding to the court. In fashioning this remedy, the court is balancing the equities and the Plan requirements in light of the novel legal issues and the ambiguity with regard to the exhaustion procedure. *See, Sereboff v. Mid Atl. Med. Serv., Inc.*, 126 S. Ct. 1869 (2006); *See also, Riverdale Cotton Mills v. Alabama & Georgia Mfg. Co.*, 198 U.S. 188, 195, (1905).

October 26, 2006                                      S/ *Peter G. Sheridan*
                                                      PETER G. SHERIDAN, U.S.D.J.