NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

———————————————————— :
                                          :
PETER A. RAETSCH, GERALDINE               :
RAETSCH and CURTIS C. SHIFLETT,           :
individually and on behalf of all others  :
similarly situated,                       :
                                          :     Civil Action No. 05-cv-5134 (PGS)
            Plaintiff,                     :
                                          :
        v.                                :
                                          :          **OPINION**
                                          :
LUCENT TECHNOLOGIES, INC., LUCENT         :
TECHNOLOGIES, INC. EMPLOYEE               :
BENEFITS COMMITTEE, AND LUCENT            :
TECHNOLOGIES, INC. MEDICAL EXPENSE        :
PLAN FOR RETIRED EMPLOYEES,               :
                                          :
            Defendant.                     :
———————————————————— :

## SHERIDAN, U.S.D.J.

This matter comes before the Court on cross-motions for summary judgment concerning the

standard of review and meaning of a provision of ERISA which allows transfers of excess pension

funds to an account to pay retiree health benefits costs without taxation.  26 U.S.C. § 420.  The

background for this matter is set forth in the Court's Opinion dated October 26, 2006 (*Raetsch 1*).

To the extent practicable, the Court adopts the facts of *Raetsch 1* herein, and repeats them only as

needed for contextual purposes.  In *Raetsch 1*, the Court opined that plaintiff had no private right of

action to challenge the propriety of a so called "§ 420 transfer" of excess pension funds to an account

which funds payment of retiree medical benefits pursuant to ERISA, 29 U.S.C. §1001, *et seq*., but

may seek damages for breach of the Plan. In addition, the Court held that the retirees must exhaust

any plan remedies prior to instituting suit.

Prior to 1990, assets of a defined benefit pension plan could not revert to an employer. In 1990, Congress modified the statute through enactment of §420 to permit employers to transfer excess pension funds, without taxation, to an account which provides medical benefits to retirees. 26 USC § 401(h). In granting this limited exception, Congress attached some conditions. One such condition is the maintenance of effort requirement ("MOE"). MOE is measured in one of two ways – cost or benefit maintenance. In 1990, the MOE required an employer who diverts excess pension funds to pay retiree medical benefits to maintain the same level of employer-provided health expenditures during the year of the transfer, plus the four succeeding years. This is known as the maintenance of cost ("MOC") standard. *See* H.R. 103-8261I (1994). The statute read in pertinent part:

> (3) Minimum cost requirements. (A) In general. The requirements of this paragraph are met if each group health plan or arrangement under which applicable health benefits are provided provides that the applicable employer cost for each taxable year during the cost maintenance period shall not be less than the higher of the applicable employer costs for each of the 2 taxable years immediately preceding the taxable year of the qualified transfer.

> (C) Applicable health benefits. The term "applicable health benefits" mean[s] health benefits or coverage which are provided to --(I) retired employees who, immediately before the qualified transfer, are entitled to receive such benefits upon retirement and who are entitled to pension benefits under the plan, and (ii) their spouses and dependents. P.L. 101-508**.**

In 1995, as the law sunsetted, Congress readopted § 420 with some modifications. More particularly, Congress altered the MOE requirements. That is, the focus of the MOE changed from cost maintenance to the benefit maintenance standard. *See* S. Rep. 103-412. The Senate Report noted the change as follows:

2

> Under the bill, the employer is required to maintain substantially the same level of employer-provided retiree health coverage for the taxable year of the transfer and the following four taxable years. The level of coverage that must be maintained will be based on coverage provided in the year immediately preceding the taxable year of the transfer.

Similarly, the House of Representatives clearly documented the change in the MOE from cost to benefit maintenance. The House Report explained:

> The present-law provision . . . is extended for 5 years with a modification to the maintenance of effort requirement and a clarification of the rules relating to amounts previously set aside to pay qualified retiree health liabilities. Under the bill, the employer is required to maintain substantially the same level of employer provided retiree health coverage for the taxable year of the transfer and the following four taxable years. H.R. Rep. 103-826 (Oct. 3, 1994).

In accordance with this clear expression of intent, Congress reauthorized §420 with amendments.

It reads:

> (A) In general.--The requirements of this paragraph are met if each group health plan or arrangement under which applicable health benefits are provided provides that the applicable health benefits provided by the employer during each taxable year during the benefit maintenance period are substantially the same as the applicable health benefits provided by the employer during the taxable year immediately preceding the taxable year of the qualified transfer.

> (C) Applicable health benefits.--The term "applicable health benefits" mean health benefits or coverage which are provided to--(I) retired employees who, immediately before the qualified transfer, are entitled to receive such benefits upon retirement and who are entitled to pension benefits under the plan, and (ii) their spouses and dependents. P.L. 103-465

Based upon the statutory amendments, sometime in 1996, Lucent readied itself to engage in §420 transfers by adopting some Pension Plan amendments. In conformity with the requirements of § 420, the Pension Plan adopted provisions that, inter alia, established a separate account ("Health Care Fund") within the pension trust where excess pension funds were deposited and from which a portion of the retiree medical benefits were paid. The Pension Plan amendment states that the Health Care Fund "shall meet the requirements of Code § 401(h)" and any transfers of pension assets would be limited to transfers that were "qualified under the Code." In addition, a transfer of pension assets would be permitted only if the Medical Plan "provides that the Applicable Health Benefits for each taxable year during the Benefit Maintenance Period are substantially the same as the Applicable Health Benefits provided by the employer during the taxable year immediately preceding the taxable year of the Qualified Transfer." *See* Pension Plan, LAR 0483, 0518-0523 (Exhibit 35). Lucent also amended the Medical Plan to recite that:

**17.11 Pension Asset Transfers**

Pursuant to Sections 401(h) and 420 of the Code, Lucent Technologies Inc. shall comply with all cost maintenance period requirements and benefit maintenance period requirements that may be applicable to this Plan for any Code Section 420 pension asset transfer by or on behalf of Lucent Technologies Inc. for qualified current retiree health liabilities (as defined under Code Section 420). With respect to any prior asset transfer by AT&T under Code Section 420, Lucent Technologies Inc. agrees to comply with the provisions of Code Section 420 for the applicable cost maintenance or benefit maintenance periods to which this Plan is subject.

Pursuant to § 420, on September 29, 1999, Lucent transferred approximately $183 million to a 401(h) account to pay retirees' medical coverage. Since Lucent's fiscal year ("FY") ends September 30 of each year, the transfer occurred in FY 1999. As a result, Lucent's MOE commenced

4

in that fiscal year and continued for four more years. There is nothing in the record which fleshes out the corporate approval process for this transfer, or whether the directors were apprised of the MOE requirements associated with this transfer at that time.

Several months later, on December 17, 1999, Congress amended the provisions of §420 yet again. At this time, Congress backtracked on the MOE requirements and reimposed the cost maintenance standard. The statute declares:

> (3) Minimum cost requirements.
>
> (A) In general. The requirements of this paragraph are met if each group health plan or arrangement under which applicable health benefits are provided provides that the applicable employer cost for each taxable year during the cost maintenance period shall not be less than the higher of the applicable employer costs for each of the 2 taxable years immediately preceding the taxable year of the qualified transfer.
>
> * * *
>
> (C) Applicable health benefits. The term 'applicable health benefits' means health benefits or coverage which are provided to--(I) retired employees who, immediately before the qualified transfer, are entitled to receive such benefits upon retirement and who are entitled to pension benefits under the plan, and (ii) their spouses and dependents.

Congress also foresaw that an overlap of conflicting employer's MOE requirements (cost/benefit maintenance periods) may occur due to the reversion to a cost maintenance standard. In the event of such a conflict, Congress directed that the benefit maintenance standard remain in effect during any such transition period. More specifically, the statute reads:

> (2) Transition rule. If the cost maintenance period for any qualified transfer after the date of the enactment of this Act includes any portion of a benefit maintenance period for any qualified transfer on or before such date, the amendments made by subsection (b) [amending subsec. (b)(1)(C), (c)(3), and (e)(1)(D) of this section]

5

shall not apply to such portion of the cost maintenance period (and such portion shall be treated as a benefit maintenance period). P.L. 106-170.

As enumerated below, the Transition Rule effects the MOE requirements of Lucent (see chart, Op. at p. 8). Within several weeks of the 1999 statutory amendment, Lucent made another §420 transfer in the amount of $191.2 million to a 401(h) account in order to pay retirees health benefits. This transfer occurred in FY 2000. There is nothing in the record which reveals whether the Board approved the transfer or knew that the MOE changed and/or was subject to the Transition Rule.

One year later, on December 27, 2000, Lucent transferred additional funds in the amount of $214 million (FY 2001). Similar to the prior § 420 transactions, there is nothing in the record which explains the circumstances surrounding this transfer.

Sometime in 2001, during the benefit maintenance period, Lucent modified certain provisions of the health care coverage provided to retirees. Although the list of changes is quite cryptic, some of the changes concern co-pays and deductibles paid by retirees. In a document entitled "U.S. Health Care and Retirement Plans Discussion" dated December, 2002, it summarizes certain revisions made in 2001:

> Some post-3/1/1990 retirees will begin paying for healthcare on a monthly basis
>
> Increased medical co-pays from $10 to $15
>
> Increased retail prescription drug co-pays from $5/$10 to $6/$15 (generic/brand name)
>
> Increased mail-order prescription drugs co-pays from $8/$15 to $9/$25 (generic/brand name)

6

> Introduced Lucent Informed Choice as an option
>
> Froze service for accrual towards the Caps for active employees as of June 30, 2001

The record is silent on whether Lucent evaluated its MOE obligations under § 420 prior to implementing these changes to the co-pays and deductibles of retirees.

The last §420 transfer occurred on December 26, 2001, in the amount of $300 million (FY 2002). Again, the record does not reflect whether Lucent considered its MOE obligation when making this transfer. In all, $888.2 million of excess pension funds were transferred pursuant to §420 to offset Lucent's obligations to pay for retiree medical benefits. The following chart (Chart 1) summarizes the transactions and applicable MOE period - cost or benefit maintenance.

CHART 1

| § 420 Transfer | Lucent Contribution from other sources | Employee Contribution | Total | Tax Year Ending | MOE | Per Capita Cost of Lucent |
|---|---|---|---|---|---|---|
| None | $189.4 | $5.3M | $194.7 | 1998 | N/A | $2,683 |
| $182.9 M 9/29/99 | $18.0 M | $6.3M | $207.2 M | 1999 (10/1/98 - 9/30/99) | Benefit | $2,835 |
| $191.2 M 12/31/99 | $19.9 M | $7.5M | $218.6 M | 2000 (10/1/99 - 9/30/00) | Benefit | $2,857 |
| $214.0 M 12/27/00 | $33.4 M | $10.8M | $ 258.2 M | 2001 (10/1/00- 9/30/01) | Benefit | $3,165 |
| $300.0 M 12/26/01 | $42.1 M | $20.6M | $ 362.7 M | 2002 (10/1/01 - 9/30/02) | Benefit | $3,689 |
| None | $340.6 | $45.2M | $ 385.9 M | 2003 (10/1/02 - 9/30/03) | Benefit | $3,768 |
| None | $255.6 M | $56.3 M | $311.9 M | 2004 (10/1/03 - 9/30/04) | Cost | $3,358 |
| None | $217 M | $36.6 M | $253.6 M | 2005 (10/1/04 - 9/30/05) | Cost | $3,246 |
| None | $209.3 M | $48.3 | $257.6 M | 2006 (10/1/05 - 9/30/06) | Cost | $3,389 |

Sometime in 2002, Lucent modified its prescription drug plan to increase co-pays of the retirees in some fashion. The only evidence in the record of this increase is a terse reference which states that Lucent imposed a "third tier of prescription drug co-pays."[1] This modification was apparently accomplished with little or no assessment of the MOE obligations.

In October, 2002, Lucent management advised the Lucent Benefits Committee (a subcommittee of the Board of Directors) about the MOE requirements. Although there is no transcript of the meeting or writings which memorialize the discussion, the highlights of the presentation were captured in a booklet distributed at the meeting. As best as can be discerned from the record, this is the first time management thoroughly explained § 420 to the Benefits Committee. Some of the bullet points contained in the booklet summarize Lucent management's assessment of their § 420 obligation. Management advised:

> The Maintenance of Effort requirement associated with Section 420 transfers and Lucent's Labor Contract impact its ability to make changes for 1/1/2003 – particularly for health benefits for Retirees and Occupational Actives.

> ***

> • Transfers made in FY 1999 or before are subject to "Maintenance of Benefit."

> In Lucent's particular circumstances, "Maintenance of Benefit" essentially means that the types and levels of health benefits that were being provided for retirees at the time of the Section 420 Transfers must be maintained until the end of FY 2003.

---

[1]    The reference stated in part:

*    Brand names split between preferred and non-preferred
$6/$15/$25: retail
$9/$25/$45: mail order

- Transfers made in FY 2000 or after are subject to "Maintenance of Cost."

  The average per capita post retirement health costs for of [sic] the group of individuals that was receiving post retirement health benefits at the time of the Section 420 Transfer must be maintained during the taxable year of the Section 420 Transfer and the following four years.

- Some flexibility exists in meeting these requirements (i.e. relatively insubstantial or incremental changes could be considered although some risk would still exist).

  ***

  Highest impact changes (i.e. those that generate the most savings) generally carry the greatest risk.

  Certain actions are likely to generate participant lawsuits, while others may generate adverse tax or other governmental actions.

The reaction of the Board to this briefing is unknown.

Undeterred by the risks of changing benefits as noted above, in December, 2002, Lucent again increased medical and prescription drug co-pays for certain retirees in 2003. Lucent summarizes:

All post-3/1/1990 retirees will begin paying for healthcare on a monthly basis:

Increased medical co-pays from $15 to $25
Increased prescription drug co-pays to:
$10/$25/$40: retail
$20/$50/$80: mail order

Again, the record does not yield any insight as to Lucent's justification for the changes to the health plan. The Lucent "Guide to Open Enrollment" for the year 2003 identifies greater changes than aforementioned, and a chart within the Guide summarizes them (See Chart II attached as an

10

addendum to this Opinion). Among other things, there is an increase in co-pays for physician visits, an increase in the annual deductible prior to medical coverage kicking in, there is an increase in the annual out-of-pocket maximum, and an increase in co-pays for mental health visits, and prescription drugs.

In December, 2004, about three years after the last § 420 transfer, Lucent amended its Pension Plan to incorporate its obligations under § 420 retroactive to January 1, 2000. These amendments "track the language of § 420." (Report of Special Committee at p. 3), and incorporate the statutory changes of December 17, 1999 (Op. at p. 5). The amendments change MOE requirements of Lucent from benefit to cost maintenance for the three § 420 transactions after December 17, 1999.[2] The amendment reads in part:

> 5.9(c) Applicable Employer Cost and Cost Maintenance Period
>
> (I)    Effective December 17, 1999, an asset transfer will be permitted only if each group health plan or arrangement provides that the Applicable Employer Cost for each taxable year during the Cost Maintenance Period is not less than the higher of the Applicable Employer Cost for each of the 2 taxable years immediately preceding the taxable year of the Qualified Transfer.
>
> (ii)   If the Cost Maintenance Period for any Qualified Transfer after the date specified above includes any portion of a BMP for any Qualified Transfer on or before such date, the provisions set forth in subsection (I) above shall not apply to such portion of the Cost Maintenance Period."

---

[2]    Lucent does not explain why it undertook $883 million in § 420 transfers, but failed to keep its Plan provisions current.

In order to calculate cost maintenance requirements, certain IRS regulations provide for a per capita calculation by dividing the number of retirees covered into total health care costs. Lucent adopted the regulation. It reads:

> (a)    Applicable Employer Cost
>
> With respect to any taxable year, the term "Applicable Employer Cost"means the amount determined by dividing (I) the qualified current retiree health liabilities of the employer for such taxable year determined without regard to any reduction under Code § 420(e)(I)(B), and in the case of a taxable year in which there was no transfer at the end of the taxable year, by (ii) the number of individuals to whom coverage for applicable health benefits was provided during such taxable year.

The amendments also recognize that its § 420 transfers are subject to either the benefit maintenance period or the cost maintenance period. Without determining which MOE applied in each year, Lucent obligated itself to "comply with all cost maintenance period requirements and benefit maintenance requirements that may be applicable."

The parties agree that for fiscal years 1999, 2000, 2001, 2002 and 2003, Lucent had a benefit maintenance requirement due to the Transition Rule, and a cost maintenance requirement for fiscal years 2004, 2005 and 2006.

As noted above, in October, 2006, the Court issued an Order requiring the Employee Benefit Committee to address the issues set forth in the Complaint (*See Raetsch 1*).  In turn, the Employee Benefit Committee delegated its authority to a special subcommittee ("Special Committee") to review the matter.  The Special Committee was comprised of Janet Davidson, George White, and Stephen R.  Rosen.  The record does not reflect any reason why these individuals were chosen.  Apparently, these individuals have no special expertise or experience with regard to § 420 transfers

nor any substantial involvement regarding Lucent's § 420 transfers.  All three members of the Special Committee were senior management employees of Lucent.[3] Janet G. Davidson was "President, Corporate Strategy" for Lucent before its merger with Alcatel, and held the post of "Global Solutions and Technology Leader" at the merged corporation. Davidson was also eligible for "two years of salary continuation" and "bonus payments."  In August, 2006, her "aggregate cash severance benefits" were reported to be about $2.4 million.  George White Jr. was Vice President Human Resources, Global Operations, and a member of the Employee Benefit Committee. Finally, Stephen R. Rosen was Vice President - Law at Lucent, and is a colleague of the attorney who represents Lucent on employee benefits.  Each of the three members received salary, plus participated in Lucent's "Long Term Incentive Program" which awards cash and stock options under certain circumstances. In addition, White and Rosen qualify for salary continuation under the Officer Severance Policy.[4]

Despite this pecuniary interest of the Special Committee members in Lucent, the Special Committee believes it is even-handed, and independent for two reasons. First, each member is eligible to receive such medical benefits upon retirement; and secondly,  they have a sense of loyalty to their friends who are retirees and who enjoy the benefits of the Plan.  The Special Committee wrote:

> The Committee acknowledges that all of its members are part of Lucent's senior management ranks, but they also understood that they

---

[3]    The Special Committee  had a very short life (November 21, 2006, through December 28, 2006).

[4]    Plaintiff alleges the findings of the Special Committee should be ignored due to conflicts of interest.  See page 30 of this Opinion.

were appointed to take on an independent role and that they are
required to act independent in this case.

Moreover, the members of the Committee point out that in addition
to being officers of Lucent, they are also Lucent benefit plan
participants with a very personal interest in how the LRIP, and the
MEPRE and the Dental Plan are interpreted and administered. All of
the Committee members are eligible to retire with full pension
benefits, so even if they were not aware of their duty to act
independent as Committee members, they are not under economic
pressures to make decision that would be favorable to Lucent's
economic interests. One of the committee members will be officially
retired on December 31, 2006 and another will retire at the end of
January, 2007.  Another of the committee members has a spouse who
is retired and receiving retiree benefits from Lucent. Moreover, given
the age and service of these members, many of them have friends and
former colleagues who are now retirees receiving benefits under the
LRIP, the MEPRE and the Dental Plan.

The Special Committee convened by telephone several times in December, 2006.  The

Special Committee conducted itself like a judicial tribunal. That is to say, the Special Committee

received briefs from counsel for both parties on the §420 transfers; the members then deliberated

with the input of counsel, Ann E. Moran of Steptoe & Johnson, LLP, and issued a Report as drafted

by Ms. Moran.[5]  During the course of the Special Committee discussions, Ms. Moran counseled the

Committee as to the requirements of §420 and at one point jotted down her mental impressions

concerning the increased co-pays and deductibles. At one point she mused  "To Ds: How can you

argue [that] an increase from [$} 75/yr to 500/yr is not signifi[cant]." (PSF ¶33).

The Special Committee failed to engage in two important tasks. First, it did not determine

to any degree of specificity Lucent's changes in health benefits during the MOE period; nor did it

investigate the discussions and decisions reached by Lucent at the time of each § 420 transfer or

---

[5]        Like many courts these days, the Special Committee did not hold oral argument.

14

adjustment to the medical plan during the MOE period. There is no indication that the Special Committee interviewed any persons at Lucent who had knowledge about the § 420 transfers and changes in benefits. Instead, the Special Committee confined itself to the issues raised by the plaintiffs. The plaintiffs presented five major issues to the Special Committee.

The first issue was whether Lucent met its obligations under the maintenance of benefits provision for years 1999-2003 since "Lucent required the retirees to pay some of the additional costs" providing medical coverage. Contrary to plaintiffs position, the Special Committee found that Lucent met its obligation because it maintained the per capita amount for each year and provided the same benefits. The Special Committee opined:

> Lucent supported the retiree health plans with essentially the same or greater per capita amount as the benchmark period, and because the retiree health plans that Lucent supported with that amount during the benefit maintenance period provided essentially the same medical products and services to the same general classes of covered retirees as in the benchmark year, Lucent has met the maintenance of benefit obligation.

The Committee noted that Lucent had "shifted" certain costs to participants through increased co-pay for doctor visits and drugs as well as deductibles, but stated these increased costs "were not sufficient to violate the maintenance of benefit requirement."

The second issue was the benchmark year against which the cost maintenance (as opposed to benefit) requirements is measured. Plaintiff argued the benchmark is the fiscal year ending September 30, 2003, while Lucent concluded it to be 2001. The Special Committee ruled that "based on a clear reading of the statute," Lucent could employ "one of the two fiscal years preceding the year of transfer." Hence, it determined 2001 met the statutory requirements.

Third, plaintiff argued the cost maintenance amount in the benchmark year should be adjusted upward to reflect an amount equal to what Lucent would have incurred if it had not raised co-pays and deductibles in violation of the benefit maintenance rule. The Special Committee rejected plaintiffs' argument based on the fact that it had found that Lucent met this requirement.

Fourth, the Special Committee addressed the issue of whether "the class of affected employees is entitled to the actuarial value of enhanced benefits from 1998 through 2006." According to plaintiff, the enhanced benefit value equals $137 million. The Special Committee negated this argument based on its three prior responses where it found that there were no violations of either the cost maintenance or benefit maintenance requirements of the Plan.

Lastly, Lucent argued that plaintiffs' claims are time barred because they were not filed within 15 months of the adverse decision as required by section 18.2 of the Plan. The Committee declined to decide the issue, but noted that the policy rationale requiring timely submission of individual claims appears to be applicable.

II.

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be

drawn in his favor.'"  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (*quoting Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists.  *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985).  The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial.  *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995).  "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment."  *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").  Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgement.  *Anderson*, 477 U.S. at 247-48.  If a court determines, "after drawing all inferences in favor of [the non-moving party], and making all credibility determinations in his favor – that no reasonable jury could find for him, summary judgment is appropriate."  *Alevras v. Tacopina*, 226 Fed. Appx. 222, 227 (3d Cir. 2007).

### III.

For organizational purposes, the Court will address each issue identified by the Special Committee in the same sequence. However, prior to doing so, there is a preliminary issue concerning the standard of review.

Both parties contend that the outcome of these motions hinge on the standard of review employed.  Plaintiffs argue that it is a *de novo* review because no deference is accorded to the

Trustees when the issue concerns statutory construction of ERISA. According to plaintiffs, the Court must construe what Congress intended when it changed the MOE provision of § 420 from cost maintenance to benefit maintenance in 1995 and vice versa in 1999. See generally, *Firestone v. Bruch*, 489 U.S. 101, 103 (1989). The defendants, on the other hand, contend that the Trustees should be given substantial deference. Since § 420 is incorporated into the Plan, defendants argue that the issue concerns a provision of the Plan, and when the Plan gives fiduciaries discretion, the Trustees are given broad latitude in interpreting them. Hence, defendants maintain that the Court should uphold the Trustees' decisions unless their actions were arbitrary and capricious. *Pinto v. Reliance Standard, Inc.*, 214 F. 3d 377, 392 (3d Cir. 2000). The defendants' argument lacks merit. The Plan incorporated the statute verbatim, and the Special Committee concedes that the Plan Amendments "track the language of § 420." In order to determine what the Plan states, the statute must be interpreted initially. Only after the meaning of the statute is determined can one review the trustees' interpretation of their MOE requirement, and analyze whether their actions comply with the statutory mandate. To accept defendants' theory would put the cart before the horse. *Cf Mobil Oil v. United States*, 530 U.S. 604, 608-12 (2000). Hence, the initial issue is what standard of review is employed when a court must interpret a statutory provision of ERISA.

When ERISA must be interpreted, it is generally a function of the judiciary to determine the meaning of the statute. As such, a *de novo* review is appropriate. The defendants do not cite to a single case where the Courts deferred to Trustees when the statutory construction of ERISA was at stake. *See generally, Harris Trust v. Solomon Smith Barney*, 530 U.S. 238 (2000); *Hughes Aircraft v. Jacobson*, 525 U.S. 432 (1999). Accordingly, a *de novo* review is appropriate here. *See Samaroo v. Samaroo*, 193 F.3d 185, 189 (3d Cir. 1999).

Defendants' reliance on the Third Circuit's sliding scale of deference for Trustees given discretion under plan is misplaced. *Pinto,* 214 F.3d at 390. A lengthy analysis of *Pinto* is unnecessary here . Suffice it to say, no deference is warranted because of the magnitude of the § 420 transfers, the impact upon retirees, and the complexities of the law. *Id.* at 383. The Court will review the matter de novo.[6]

III.

The Court must analyze the statute in context of the issues determined by the Special Committee. The Court begins by briefly setting forth the general analytical framework underlying our construction of the provision at issue. The role of the courts in interpreting a statute is to give effect to Congress's intent. *See Idahoan Fresh v. Advantage Produce, Inc.,* 157 F.3d 197, 202 (3d Cir. 1998), (citing *Negonsott v. Samuels,* 507 U.S. 99, 104 (1993)), *Rosenberg v. XM Ventures,* 274 F.3d 137, 141-42 (3d Cir. 2001).

Because it is presumed that Congress expresses its intent through the ordinary meaning of its language, every exercise of statutory interpretation begins with an examination of the plain language of the statute. *See, Idahoan,* 157 F.3d at 202 (citing *Santa Fe Med. Servs., Inc. v. Segal (In re Segal),* 57 F.3d 342, 345 (3d Cir. 1995); *United States v. Pelullo,* 14 F.3d 881, 903 (3d Cir. 1994). Where the statutory language is plain and unambiguous, no further inquiry is required. See *In re*

---

[6]Assuming *Pinto*'s deference standard did apply, the Court finds that under *Pintos'* factors, little to no deference should be accorded; because Lucent funds the plan on a pay-as-you-go basis out of operating funds, it could face a significant tax penalty if the transfers are attached; and finally  the claims are asserted by a large group of retirees. *See; Post v. Hartford Insurance Co.,* 501 F.3d 154, 162 (3d Cir. 2007); *Vitale v. Latrobe Area Hosp.,* 420 F.3d 278, 283 (3d Cir. 2005) compare *Bill Gray Enters., Inc. Employee Health & Welfare Plan v. Gourley,* 248 F.3d 206, 217-18 (3d Cir. 2001); *Tylwalk v. Prudential Ins., Co.,* 257 Fed. Appx 568 (3d. Cir. 2007); *Post,* 501 F.3d at 163-64.

19

*Segal*, 57 F.3d at 346. To determine whether the statutory language is ambiguous, we must examine "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *See Marshak v. Treadwell*, 240 F.3d 184, 192-93 (3d. Cir. 2001), quoting, *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).   In addition, when interpreting a statute, courts should endeavor to give meaning to every word which Congress used and therefore should avoid an interpretation which renders an element of the language superfluous. See *United States v. State of Alaska*, 521 U.S. 1 (1997), reh'g denied, 521 U.S. 1144 (1997); *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 550  (1996) (reading which gives effect to all of a statute's provisions prevails over one which disregards a provision as legislative oversight); *First Bank Nat'l Ass'n v. FDIC*, 79 F.3d 362, 367 (3d Cir. 1996).   Thus, the preferred construction of a statute and its regulations is one that gives meaning to all provisions. *See United States v. Higgins*, 128 F.3d 138, 142 (3d Cir. 1997).   The purpose of the statute must also be kept in mind.   With regard to ERISA, Congress intended to establish uniform national treatment of pension benefits.  *Raymond B. Yates MD Profit Sharing v. Hinden*, 124 S. Ct. 1330, 1341 (2004). Its principal object is to protect plan participants and beneficiaries.  *Boggs v. Boggs*, 520 U.S. 833, 845 (1997).   Given these purposes, ERISA is to be construed liberally to safeguard interests of fund participants and beneficiaries, and to preserve integrity of fund assets.  *Smith v. Contine*, 205 F. 3d 597, 604 (3d. Cir. 2000) *cert. denied*, 531 U.S. 875 (2000); *In re Enron Securities*, 284 F. Supp. 2d 511 (S.D. Tex. 2003).   Congress's chief purpose in enacting the statute was to ensure that workers receive promised pension benefits upon retirement.  *Smith*, 205 F. 3d at 604.   With these principles in mind, we turn our attention to § 420 and the issues decided by the Special Committee.

\*      <u>Special Committee Issue 1 - Whether Lucent Met Its Benefit Maintenance Requirements</u>

The parties agree that Lucent was required to comply with the benefit maintenance provision of § 420 for the fiscal years 1999-2003. Pursuant to this statute, Lucent's § 420 transfer qualified so long as Lucent "provided . . . health benefits . . . during each taxable year during the benefit maintenance period [that] are substantially the same as the applicable health benefits provided by [Lucent] during the taxable year immediately preceding the taxable year of the qualified transfer". (*See* Op. at p. 3 for text of statute). The statutory language is straightforward, clear, and unambiguous. Lucent is required to provide substantially the same health benefits.

Lucent adopted this statute by reference into the Plan. As such, the Court must determine whether Lucent adhered to the ordinary meaning of the said statute when administering the Plan. Lucent contends it met the benefit maintenance obligation by providing "the retiree health plans with essentially the same or greater per capita amount as the benchmark period and . . . essentially the same medical products and services." (Op. at p. 5). Lucent crafts a two prong argument. That is, it spent the same on a per capita basis while maintaining the same medical products and services. Each prong will be considered separately.

First, Lucent argues that it spent "the same or greater per capita amount" on health benefits for each retiree, and such spending is consistent with the benefit maintenance standard. While the per capita amount expended is germane if the cost maintenance standard were at issue, it is not relevant to benefit maintenance. Congress clearly rejected cost maintenance in December, 1995, and opted for benefit maintenance. A simple comparison of the language of § 420 before and after the 1995 Amendment illustrates this point. Prior to December, 1995, § 420 stated that "the applicable employer <u>cost</u> for each taxable year during the <u>cost</u> maintenance period shall not be less than the higher of the applicable employer <u>costs</u> of the two taxable years immediately preceding" the transfer.

In contrast, the amended statute required that "the applicable health <u>benefits</u> provided by the employer during each taxable year during the <u>benefit</u> maintenance period are substantially the same as the applicable health <u>benefits</u> provided by the employer during the taxable year immediately preceding the taxable year of the qualified transfers." Obviously, Congress was cognizant that by substituting the word "benefits" for "costs," it was changing the focus of an employer's MOE. That is, benefits and not cost became the rule. Lucent's per capita cost analysis does not comport with the plain language of the 1995 amendment which requires it to maintain substantially the same health benefits.[7]

The second prong of the Special Committee's analysis is that it met the "benefit maintenance standard" because it provided substantially the same "medical products and services" within the plan. It appears that the Special Committee considers the phrase "medical products and services" to be

---

[7]     The Special Committee latches onto a single sentence in the legislative history to justify its position that a per capita cost calculation is germane to both a cost and benefit maintenance analysis. According to the House Report, the MOE was modified "to ensure that employers can take into account cost savings that are realized in the health benefits plans." The Committee fails to recognize the rubric of statutory construction that the Court will not consider the legislative history if the statute is clear and unambiguous. As Justice Thomas noted "in ERISA cases as in any case of statutory construction, our analysis begins with the language of the statute . . . and where the statutory language provides a clear answer, it ends there as well." *Harris Trust*, 540 U.S. at 254. There is no ambiguity here. Secondly, assuming the legislative history is relevant, the cited language does not clearly apply to increases to deductibles and co-pays as is the issue here. More probably, the language in the House Report is a vague acknowledgment that employers could undertake certain other cost saving measures without violating the benefit maintenance rule. One such mechanism is reducing the number of participants in accordance with a regulation promulgated by Treasury Regulation 81.420-1(b)(2). Prior to 1995, if an employer reduced the number of covered retirees, it was unclear whether such cost savings were allowed under the cost maintenance standard. By changing the MOE to a benefit maintenance standard, cost savings through a reduction in the number of covered retirees is permissible, so long as substantially the same benefits are maintained. In short, reliance upon this single sentence in the legislative history is misplaced.

synonymous with the word "benefits" as used in the statute. Although the argument is inviting, on closer examination, it does not ring true. Plaintiffs' complaint is that Lucent raised the co-pays and deductibles on many, if not all, medical items and services. Lucent attempts to avoid liability by arguing that medical products and services constitute health benefits; co-pays and deductibles are treated separately. To the contrary, the Court finds that the term "health benefits" as used in the statute incorporates and includes both medical products and services as well as the co-pays and deductibles. The Court relies on Lucent's practice. Referring to the addendum to this Opinion (Chart 2 which is an excerpt from the Open Enrollment Guide of 2003), the changes in health benefits offered to retirees are enumerated on the Chart. In the first column, the medical service is listed, and the second and third column of the Chart sets forth the applicable deductibles and co-pays in 2002 and 2003. The point is that Lucent's Open Enrollment Guide demonstrates that medical products and services are interwoven with co-pays and deductibles. There is nothing in the record (except for the Special Committee's decision) where these terms are not considered together. This interpretation comports with common sense. There is no reason to believe Congress, when it changed the MOE from cost to benefit maintenance, intended otherwise. Hence, the Special Committee's position that the term "health benefits" solely refers to "medical services and items" is rejected. There is no logical basis for delinking medical products and services from co-pays and deductibles when the term "health benefits" is at issue. Hence, the term "health benefits" as envisioned by Congress incorporates both medical services and items together with the concomitant co-pay and deductibles. Lucent's management appears to agree with this interpretation. In October, 2002, when it advised the Benefit Committee about the risks associated with § 420 transfers, it concluded that "maintenance of benefits essentially means the types and levels of health benefits that were being

provided to retirees . . . must be maintained until the end of FY 2003." (*See* Op. at p. 9). Obviously, the phase "types and levels" is a clear reference to medical services and items (types) and co-pays and deductibles (levels).

The issue which inures is whether Lucent provided "substantially the same health benefits" as it did in the benchmark years. Lucent posits that since it maintained the same per capita expenditures and the same medical services and items, it fulfilled "substantially the same" mandate. For the reasons set forth above, the Court rejects this rationale; however, the record fails to provide sufficient facts to evaluate whether the medical services and items together with the co-pays and deductibles were substantially the same in each benefit maintenance year.

For the years prior to fiscal year 2003, the record is not clear cut. Although the record evidences that deductibles and co-pays rose, the nature and scope of such changes is not fully explained. For example, Lucent in a document entitled "U.S. Health Care and Retirement Plans" acknowledged that in 2001 co-pays for medical visits increased from $10 to $15. From this information, the Court can not determine whether medical co-pays applied to in-network, or out of network services or both. It would be speculative to guess. Absent concrete evidence regarding the nature of the changes to health benefits, the Court is adverse to entering judgment on the issue. The parties should conduct discovery to determine the precise changes in health benefits during the benefit maintenance period.

In the last benefit maintenance year (FY 2003), the health benefits were not substantially the same. Once again, utilizing the addendum (Chart 2), one can glean that there were across-the-board changes in co-pays and deductibles. For instance, the annual deductible for retirees rose from $50.00 plus 1% of pension to $150.00 plus 1% of pension; maximum annual out of pocket rose by $500.00

for an individual, and by $1,500 for a family of more than two. In addition, co-pays for medical visits increased by $10.00 per visit in network, and co-pays for mental health services rose by $25.00. Lucent argues even if certain costs were shifted to retirees, since Lucent maintains its per capita spending the same, it met the statute's requirement.  Accordingly, Lucent argues to determine whether it provided substantially the same health benefits, the Court should view the facts from the perspective of the employer (employer per capita costs). The Court disagrees.

ERISA is remedial legislation and it is liberally construed to protect the interests of participants in employee benefits plans. ERISA § 1001; *See Aetna Health v. Cigna Health*, 542 U.S. 200, 208 (2004).  Congress desired that workers receive promised health benefits. *Boggs v. Boggs*, 520 U.S. 833, 845 (1997).  Although maintaining per capita cost may be a factor, the controlling issue is whether the increase in co-pay and deductibles in each benefit maintenance year constitutes a substantial change in health benefits from the perspective of the retiree.  Mindful that most retirees are on a fixed income, and utilize health benefits regularly, the comprehensive rise in deductibles and co-pays in 2003 is significant.


\*      Special Committee Issue 2 - Whether Lucent Met its Cost Maintenance Requirements


The next issue which the Special Committee decided was whether the cost maintenance obligation was violated by the changes to the Pension Plan. This issue requires the Court to interpret § 420 and in particular the Transition Rule.  Although the Transition Rule is quite clear that the benefits maintenance period continues where there is overlapping cost/benefit maintenance obligations, it is unclear on how to transition back to the cost maintenance period where there is a series of § 420 transfers once the benefit maintenance period expires. The parties have alternative

theories – neither of which is clearly supported by the statute.  Plaintiffs contend that the cost maintenance obligation is established by taking the first year in which a cost maintenance obligation occurs (2004), and then determining the benchmark year by applying the higher per capita cost of the two previous years.  In that case, the year 2003 has the higher per capita cost ($3,768.00). S*ee* Chart 1, at p. 8).  Using this as the benchmark amount and comparing it to the per capita cost in the cost maintenance years, Lucent fails to meet its obligation because the per capita cost in FY 2004 was $3,358, in FY 2005 was $3,246, and in 2006 was $3,389.  This approach ignores the fact that the Transition Rule instructs that the benchmark date is linked to the date of the § 420 transfer. There were no transfers in 2004. Contrary to plaintiff, a reasonable reading of the Transition Rule would lead one to conclude that the Transition Rule does not  alter the methodology for determining the benchmark year; it merely suspends imposition of the cost maintenance period.  As a result, the Court rejects plaintiffs' hypothesis because it is inconsistent with the statutory language.

Lucent and the Special Committee have a different approach. Recognizing there were three § 420 transfers subsequent to the adoption of the 1999 statutory amendments, Lucent determined that the last § 420 transfer (fiscal year 2002) should be the year from which the benchmark amount is ascertained. Using 2002 as the starting point, Lucent determined that the higher per capita cost of the two preceding years occurred in 2001 ($3,165). This is the benchmark amount.  Comparing the benchmark amount ($3,165) to the per capita costs in the other cost maintenance years, Lucent meets its requirement because the per capita cost in FY 2004 was $3,3358, in FY 2005 was $3,246, and in 2006 was $3,389.  Although this is more in accord with the 1999 Amendment than Plaintiffs' version, Lucent does not explain why the last § 420 transfer is more appropriately used than the first

26

two post-1999 Amendment transfers. There is nothing in the statute which authorizes skipping to the last § 420 transfer when determining cost maintenance obligations.

The Court adopts a third approach. It is admittedly more complicated; but it recognizes the impact of each of the post-1999 Amendment § 420 transfers.

Under the Court's approach, the benchmark amount is figured in the fiscal year of the § 420 transfer. The first post 1999 Amendment § 420 transfer of $191.2 million occurred in FY 2000. Accordingly, the benchmark year is either FY 1999 or 1998, depending upon which year Lucent incurred the higher per capita. FY 1999 had the higher per capita cost ($2,835). The MOE period of this § 420 transfer is for the years 2000, 2001, 2002, 2003, and 2004. Since the cost maintenance obligation was suspended during the first four years due to the Transition Rule, the benchmark comparison only applies to 2004 where the per capita cost is $3,358. Since Lucent's per capita expenditures ($3,358) in 2004 exceeded the benchmark amount ($2,835), Lucent tentatively met its obligation.[8]

The second post-1999 amendment § 420 transfer of $214 million occurred in FY 2001. Using the same logic as above, the benchmark year is 2000, where the per capita cost is $2,857. The MOE period is for the years 2001, 2002, 2003, 2004 and 2005. This benchmark only applies to 2005 because the Transition Rule applies to the first three years and the Court's rationale in the preceding paragraph applies to 2004. In comparing the benchmark amount ($2,857) to the per capita expenditure in 2005 ($3,246), Lucent tentatively met its cost maintenance obligation in FY 2005.

Similarly, the third post-1999 Amendment § 420 transfer would only apply to FY 2006

---

[8]    This determination is tentative or provisional because the per capita expenditures may change due to the Court's ruling on Special Committee Issue 3.

obligation. That is, the benchmark amount for the FY 2002 transfer is $3,165. Lucent's per capita expenditure in 2006 is $3,389. Hence, Lucent tentatively met its obligation in FY 2006.

Admittedly, the aforementioned application is far from perfect; but this methodology recognizes that each of the § 420 transfers had an impact on Lucent's obligation. In addition, it maintains the Congressional intent of correlating the year of the § 420 transfer date to the benchmark amount and MOE periods, and it gives meaning to all of the provisions of the 1999 Amendments. *See United States v. Higgins*, 128 F. 3d 138, 142 (3d Cir. 1997).

\*    Special Committee Issue 3- In determining Cost Maintenance Obligation for 2004, 2005 and 2006, should Lucent's Obligation in the benchmark years be increased to reflect the increase in costs Lucent should have incurred if it did not change health benefits (Enhanced Benefits)

As held above, the Court has ruled that Lucent did not provide substantially the same health benefits to the retirees in 2003 and potentially in other years. In order to answer the inquiry here, the years in which health benefits were changed may require that the per capita costs be adjusted by the cost of providing Enhanced Benefits. However, the cost of Enhanced Benefits is unknown, and the Court is uncertain whether that amount is ascertainable to a reasonable degree of probability. As such, this issue is not ripe for determination. The decision may swing on a number of factors, including the quality of the proofs establishing the reasonableness of such an adjustment. Plaintiff may conduct discovery on the issue and renew its motion thereafter.

\*    Special Committee Issue 4 - Whether the Class of Effected Retirees is Entitled to Actuarial
           Value of the Enhanced Benefits Estimated to be $137 million

Evidently there is a "data compilation" assembled by Aon, an actuarial consultant, which pegged the value of the Enhanced Benefits at $137 million. This estimate has not been vetted or

contested before this Court, and the assumptions upon which it relied are unknown. The Court has no way of determining the reliability of the data compilation at this time. In addition, the Court has not determined whether individualized factual determinations is a more reasonable approach to calculating damages, if any. As such, the issue is not ripe for adjudication.

As a corollary to this issue, Defendants move to strike ¶¶ 109-112 of Plaintiffs' Rule 56.1 statement in opposition to their motion for summary judgment. Defendants maintain that these paragraphs give rise to additional fact questions based upon the data compilation. Since the Court has elected not to rely on the Aon data compilation at this time, the motion is denied as moot.

\*     <u>Special Committee Issue 5.  Whether  claims of Plaintiffs are time barred. </u>

The final issue mentioned by the Special Committee was whether the retirees are time barred because they did not file their claims within 15 months of the adverse decision pursuant to the terms of Section 18.2 of the Plan. Section 18.2, entitled" Time Limitation for Submission of Incurred Claims" reads:

> To the extent claim forms are required under the Indemnity Options, the POS Option (for Out-of-Network services) or Lucent Informed Choice Option, the Participant and Providers must send properly completed claim forms to the applicable Claims Administrator as soon as possible after the medical expenses are incurred; provided, however, that no claim shall be paid under the Plan to the extent the claim form is submitted more than 15 months from the date of service.

The issue was discussed in *Raetsch 1* where the Court found there was confusion in the Plan as to whether comprehensive changes to deductibles and co-pays fall within the parameters of Section 18.2 regarding the timeliness of claims. The Special Committee did not address same because it found no substantial basis for Plaintiffs' complaints.  But it noted the policy rationale

requiring timely submissions applies since "review and correction is made much more difficult after years have passed."

The Court finds Section 18.2 does not apply here. Its very terms suggest individual claims related to specific medical services were the subject of this provision. Here, the issue concerns wholesale changes in co-pays and deductibles, as opposed to individualized adjudication of coverage of specific claims. This determination does not prejudice Lucent. Lucent caused its own dilemma. As noted earlier, the evidence in the record is that Lucent undertook minimal, if any, steps to ascertain its MOE requirement or communicate those requirements to the retirees. At the very least, Lucent should have hired independent counsel or auditors to monitor its MOE obligation in order to assist it in determining its obligations during the MOE period. Having failed to do so, Lucent opened itself up to this risk. In addition, there is evidence that Lucent envisioned this law suit. In late 2002, management advised the Benefits Committee that jacking up co-pays and deductibles may give rise to complaints and claims by retirees. They stated that "certain actions could generate participant law suits." Accordingly, it is disingenuous for Lucent to argue that Lucent had no notice of the potential claims or is prejudiced by allowing this suit to proceed.

VII.

Miscellaneous Issues

Plaintiffs contended that the members of the Special Committee have a conflict of interest because of their significant compensation packages. More specifically, Plaintiffs contends that due to their salaries, deferred compensation, and stockholdings in Lucent, the members' loyalty lies with the corporation rather than with the pensioners. The Court rejects same. This reasoning taken to the logical extreme would create a conflict whenever employers acted as fiduciaries of an ERISA plan.

This would unnecessarily exclude all active employees from acting as a fiduciary to an ERISA plan which is a very common practice. Without more, a pecuniary interest alone is insufficient to establish a debilitating conflict. Although there is no conflict, the actions of Lucent and the Special Committee are troublesome for two reasons.

First, in *Raetsch 1*, Lucent's counsel effectively argued that this Court should defer to the Trustees regarding the § 420 transfers in light of the Trustees' experience and expertise. Because ERISA is a comprehensive and reticulated statute and is enormously complex and detailed, the Court accepted that approach. *See Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 447 (1999). Accordingly, in *Raetsch 1*, the Court wrote:

> The courts generally favor compliance with exhaustion provisions because they can often resolve disputes without court involvement; or alternatively the process crystalizes the issues, and the court has the benefit of the reasoning of those entrusted with implementing the plan. *See*, *Henshaw v. Roofers Local #4 Pension Fund*, Slip Copy, 2006 WL 2715138 at *2 (D.N.J. Sept. 22, 2006). As Judge Cavanaugh found, "The board of trustees who administers ERISA plans "are granted broad fiduciary rights and responsibilities under ERISA . . . and implementation of the exhaustion requirement will enhance their ability to expertly and efficiently manage their funds by preventing premature judicial intervention in their decision-making process." *Id*. (quoting *Amato v. Bernard*, 618 F.2d 559, 567 (9th Cir. 1980)). *See also*, *Zipf v. Am. Tel. & Tel. Co.*, 799 F.2d 889, 892 (3d Cir. 1986).

The Court, based on the assertions of counsel, assumed that the Trustees' experience and expertise with regard to § 420 transfers would bear on the issues before the Court. In lieu of "obtaining the benefits of the reasoning of those entrusted with implementing the Plan" between 1999 and 2006, as expected, the Trustees punted. That is, they appointed three persons without any adequate rationale. The record does not reveal whether the Special Committee members had any prior

31

experience or expertise with § 420 transfers .   The most important reason for referring the matter

back to the Trustees was to obtain the benefit of Lucent's institutional knowledge with regard to §

420 transfers and medical plan amendments in question.   That is the precise reason the Court

specifically directed that the Trustees to "report its factual and legal finding to the Court." *Raetsch*

*I* at 14.  To the contrary, the Report of the Special Committee[9] noticeably lacks any detailed facts

as to the events which occurred within Lucent from 1996 through the date this law suit was filed.

Not even the most basic measures to ascertain the facts were undertaken such as interviewing those

employees  who were involved with the transfers.

Second, the Trustees, as fiduciaries to the Plan participants, must act with care, skill,

prudence, and diligence. *See Whitfield v. Tomasso*, 682 F. Supp. 1287 (E.D.N.Y 1988).   More

particularly, the Trustees had an ongoing obligation to make certain that Lucent fulfilled its § 420

MOE obligation. *See generally In re Unisys*, 173 F. 3d 145 (3d. Cir. 1999) *cert. denied Mernhardt*

*v. Unisys*, 528 U.S. 950 (1999). The record is void of any such evidence.  As noted previously, there

was only one substantive presentation regarding same.  Sometime in 2002, management alerted the

Benefits Committee that changes to the retiree medical plan carried "risk" pursuant to its MOE

obligation; however, there is nothing in the record which reflects that the Trustees took any actions

to determine whether the Plan was in compliance with its § 420 obligation at that time.  Moreover,

with knowledge of the risk, the Directors authorized more changes in the form of higher co-pays and

deductibles.  Any reasonably diligent Trustee would have taken steps to ensure compliance.  Obvious

steps such as obtaining an opinion from Lucent's counsel or  auditors were not taken.

---

[9]        The Special Committee was assisted by competent counsel; but that does not
excuse the lack of fact finding before deciding the matter.

Although the Court does not make any conclusion based on the above, it looks upon the actions of Lucent and the Trustees with a great deal of circumspection.

VIII.

Plaintiffs moved for certification of this action as a class action. Proposed Lead Plaintiffs Peter A. Raetsch, Geraldine Raetsch, and Curtis C. Shiflett, move individually and on behalf of others similarly situated to certify this action as a class action. Plaintiffs seek certification of the class defined as follows:

> All persons who are (or who have been) participants or beneficiaries in the Lucent Technologies, Inc., Retirement Income Plan and in the Lucent Technologies, Inc., Dental Expense Plan for Retired Employees and who were eligible to receive benefits under the latter two plans at any time during the period September 29, 1999 through September 30, 2006. Excluded from the class are defendants and the officers and directors of Lucent Technologies, Inc., at any during the class period stated above, the members of their immediate families, and their legal representatives, heirs, successors or assigns.

Plaintiffs generally maintain that satisfy the requirements of Fed.R.Civ.P. R. 23 (a) and R. 23(b)(1)-(3) or in the alternative Rule 23(B)(3) and the class counsel requirements in Rule 23(g) have been satisfied. Defendants maintain that class certification is premature and generalized factual and legal issues preclude class certification. This Court agrees with Lucent and will deny class certification at the present stage of litigation, without prejudice for renewal upon completion of the discovery as discussed previously in this Opinion.

The Court in deciding a motion for class certification, must be satisfied "after a rigorous analysis" that all the requirements for class certification are met. *General Telephone Co. v. Falcon*, 457 U.S. 147, 160 (1982). As the Third Circuit has made clear, failure to follow the procedures

required before approving a class action is an abuse of discretion. *In re Community Bank of Northern Virginia*, 418 F.3d 277 (3d Cir. 2005). The Third Circuit opined:

> We conclude that the plain text of Rule 23(c) as amended requires more specific and more deliberate treatment of the class issues, claims, and defenses than the practice described above has usually reflected. More specifically, in our view, the proper substantive inquiry for an appellate tribunal reviewing a certification order for Rule 23(c)(1)(B) compliance is whether the precise parameters defining the class and a complete list of the claims, issues, or defenses to be treated on a class basis are readily discernible from the text either of the certification order itself or of an incorporated memorandum opinion.

*Wachtel v. Guardian Life Ins., Co.*, 453 F.3d 179, 184 (3d. Cir. 2006)

This Court is unable to make a ruling at this stage for two reasons. First, plaintiffs require discovery on several issues and most importantly, essential items such as the class period have not been determined since it is unknown whether Lucent met its cost maintenance requirements for FY 2004, 2005 and 2006 due to the Enhanced Benefits issue (Special Committee Issue 3).

An appropriate Order shall issue.


*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.


June 11, 2008

Addendum (Chart 2)

**Plan Changes at a Glance:**

Here's a high-level overview of the plan changes in place for 2003. More details on the changes are provided in the *Other Medical Plan Changes Effective January 1, 2003* section beginning on page 10.

**Key Point**

There are new coverage levels that will affect certain limits and the deductibles you need to satisfy depending on the plan you choose.

Coverage levels are changing from two to three:

- 2002 – Individual and Family; to
- 2003 – Individual, Two-Person and Family.

| Medical Plan Changes | | |
|---|---|---|
| What's Changing | 2002 Amounts | 2003 Amounts |
| POS Plan | | |
| Office Visit Copay (in-network) | $15 per visit | $25 per visit |
| Annual Deductible (out of network) | $400 individual $800 family | $500 individual $1,000 Two person $1,500 family |
| Hospital Admission Deductible (out-of-network) | $150 | $200 |
| Annual Out-of-Pocket Maximum (out-of-network) | $2,500 individual $5,000 family | $3,000 individual $6,000 two person $9,000 family |
| Lucent Informed Choice | | |
| Office Visit Copay (in-network) | $15 per visit | $25 per visit |
| Annual Deductible (in-network, other than office visits) | None | $300 Individual $600 Two-Person $900 Family |
| Annual Deductible (out-of-network) | $400  Individual $800 Family | $600 Individual $1,200 Two-Person $1,800 Family |
| Annual Out-of-Pocket Maximum (in-network) | $750 individual $1,500 family | $1,000 Individual $2,000 Two-Person $3,000 Family |
| Annual Out-of-Pocket (Maximum out-of-network | $2,500 Individual $5,000 Family | $3,000 Individual $6,000 Two-Person $9,000 Family |

| Traditional Indemnity Plan | | |
|---|---|---|
| What's Changing | 2002 Amounts | 2003 Amounts |
| Copay | 80% or 100%<br>(depending on service) | 80% for all services |
| Annual Deductible | If you are participating in the Family Security Plan or have access to retiree health coverage under the Account Balance Program:<br>$200  Individual<br>$400 Two Person<br>$600 Family | If you are participating in the Family Security Plan or have access to retiree health coverage under the Account Balance Program:<br>$300  Individual<br>$600 Two Person<br>$900 Family |
| Annual Deductible | If you are a retiree:<br>**Individual:** $ 50 plus 1% of pension ($ 75 minimum and $ 200 maximum)<br>**Two-Person:** 2 x individual deductible<br>**Family:** 3 x individual deductible | If you are a retiree:<br>**Individual:** $ 150 plus 1% of pension ($ 175 minimum and $ 300 maximum)<br>**Two-Person:** 2 x individual deductible<br>**Family:** 3 x individual deductible |
| Annual Out-of-Pocket | $1,000 Individual<br>$3,000 Family | $1,500 Individual<br>$3,000 Two-Person<br>$4,500 Family |
| Mental Health and Chemical Dependency Program*<br>This plan design does not apply to Medicare-eligible participants) | | |
| Copay for first 10 office visits (in-network) | None | $25 per visit |
| Copay for all visits after first 10 (in-network) | $10 per visit | $25 per visit |
| Annual Maximum for outpatient treatment | None - in-network<br>60 visits - out of network | 50 visits (in and out-of-network combined) |
| Annual Maximum for inpatient treatment | None - in-network<br>30 visits - out of network | 120 days (in and out-of-network combined)<br>30 days (out-of-network) |
| Annual Out of Pocket Maximum (in-network) | $750 | None |

| Prescription Drug Program | | |
|---|---|---|
| What's Changed | 2002 | 2003 |
| Retail Copays | $6 generic<br>$15 formulary brand<br>$25 non-formulary brand | $10 generic<br>$25 formulary brand<br>$40 non-formulary brand |
| Mail Order Copays | $9 generic<br>$25 formulary brand<br>$40 non-formulary brand | $20 generic<br>$50 formulary brand<br>$80 non-formulary brand |
| Annual Out-of-Pocket Maximum | $750 per person for prescriptions filled in-network or by mail order | $1,000 per person for prescriptions filled in-network or by mail order |

These programs do not apply if you have HMO coverage.
Note:  If you are receiving coverage under COBRA, please refer to your personal information.

***Other medical plan changes effective January 1, 2003***

•       You may no longer apply for an individual policy when you lose eligibility under the Medical Plan or when your COBRA continuation coverage ends.  Previously, this conversion feature was available for certain health plan options.

•       If you are enrolled in the POS option, you will no longer be able to enroll your out-of-area dependents in the Traditional Indemnity Plan.  If your dependent has expenses under the POS, they will be administered as out-of-network benefits subject to the terms of the plan

| FISCAL YEAR | MEDICAL PLAN | DRUG PLAN |
| --- | --- | --- |
| 2001 | Monthly premiums instituted for certain participants whose plan participation was based on a retirement on or after March 1, 1990<br><br>For POS Participants:<br><br>Copay for doctor visits increased to $ 15<br><br>Annual out-of-pocket maximum for in-network expenses increased to $ 1,000 per individual, $ 2,000 per family | Copay for generic drugs increased to $ 6 retail/<br>$ 9 mail order<br><br>Copay for brand name drugs increased to $ 15 retail/$ 25 mail order |
| 2002 | For POS Participants:<br><br>Annual out-of-pocket maximum for in-network expenses increased to $ 2,500 per individual; $ 5,000 per family | Copay for non-formulary/ nonpreferred brand drugs instituted – $ 25 retail/$ 40 mail order |
| | | |

| 2003 | Monthly premiums increased for all participants whose plan participation was based on a retirement on or after March 1, 1990 | Copay for generic drugs increased from $ 6 retail/$ 9 mail order to $ 10 retail/$ 20 mail order |
|---|---|---|
| | Coverage levels for certain limits and deductibles increased from two levels (individual and family) to three levels (individual, two-person, and family) | Copay for brand name drugs increased from $ 15 retail/$ 25 mail order to $ 25 retail/$ 50 mail order |
| | <u>For POS participants:</u> | |
| | Copay for in-network doctor visits increased from $ 15 to $ 25 per visit | Copay for non-formulary brand drugs increased – from $ 25 retail/$ 40 mail order to $ 40 retail/$ 80 mail order |
| | Annual out-of-network deductible increased – from $ 400 to $ 500 per individual; $ 1,000 per two-person household; and from $ 800 to $ 1,500 per family | |
| | Out-of-network hospital admission deductible increased –from $ 150 to $ 200 per admission | |
| | Annual out-of-network out of pocket maximum increased – from $ 2,500 to $ 3,000 per individual; $ 6,000 per two-person household; and from $ 5,000 to $ 9,000 per family | Copays and coinsurance for outpatient chemotherapy instituted |
| | <u>For Lucent Informed Choice participants:</u> | Annual out-of-pocket maximum increased from $ 750 to $ 1,000 per person |
| | Copay for doctor visits increased from $ 15 to $ 25 per visit | |
| | Annual in-network deductible instituted – $ 300 per individual, $ 600 per two-person household, and $ 900 per family | |
| | Annual out-of-network deductible increased – from $ 400 to $ 600 per individual; $ 1,200 per two-person household; and from $ 800 to $ 1,800 per family | |
| | Annual in-network out of pocket maximum increased –   from $ 750 to $ 1,000 per individual, $ 2,000 per two-person household, and from $ 1,500 to $ 3,000 per family | |
| | Annual out-of-network out of pocket maximum increased – from $ 2,500 to $ 3,000 per individual, $ 6,000 per two-person household, and from $ 5,000 to $ 9,000 per family | |
| | For Traditional Indemnity Participants: | |
| | Coverage level reduced to 80% for all services | |
| | Annual deductible increased – from $ 50 plus 1% of pension (subject to $ 75 minimum and $ 200 | |

| 2004 | Monthly premiums increased for participants whose plan participation was based on a retirement on or after March 1, 1990 | Annual out-of-pocket maximum increased to $ 1,500 per person |
| | Reimbursements to all retirees and dependents for Medicare Part B premiums terminated | |
| | Company-paid dental coverage for all retirees and dependents terminated | |
| | Company subsidies terminated for dependents of management retirees who retired on or after March 1, 1990 and whose base salary at retirement was $ 87,000 or more | |
| | For POS participants: | |
| | Coverage for hospital outpatient services reduced to 90% in-network and 70% out-of-network | |
| | Emergency Room copay increased from $ 40 to $ 50 for each visit | |
| 2005 | Company subsidies terminated for dependents of management retirees who retired on or after March 1, 1990 and whose base salary at retirement was $ 65,000 or more | |
| | For POS and Traditional Indemnity participants: | |
| | Amount used to determine Reasonable & Customary charges for non-network services and supplies reduced (to charge based on 8 out of 10 providers) | |
| 2006 | Monthly premiums instituted for participants whose plan participation was based on a retirement on or after March 1, 1990 and who are (1) non-represented occupational retirees, (2) non-represented LBA retirees, and (3) formerly represented retirees who participate in the management retiree medical plan design | |

Sources:     2001:  Pl. Ex. 39 at LAR 004976; Pl. Ex. 38 at LAR 000231
             2002:  Pl. Ex. 40 at LAR 004953-4954
             2003:  Pl. Ex. 40 at LAR 004950, 004952-4954, 004956
             2004:  Pl. Ex. 41 at LAR 005013-14, 005021-23
             2005:  Pl. Ex. 42 at LAR 000158
             2006:  Pl. Ex. 43 at LAR 003011